IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEREMY DUT HING CHIU,

    Petitioner,                                    No. CIV S-06-962 MCE CHS P

    vs.

RICHARD KIRKLAND, et al.,

    Respondents.              <u>FINDINGS AND RECOMMENDATIONS</u>

                                 /

## I. INTRODUCTION

Petitioner Jeremy Dut Hing Chiu is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. Petitioner was convicted of murder with special circumstances and other offenses in the Sacramento County Superior Court, case 01F06209, and received a sentence of life without the possibility of parole in addition to an 18 year term, with an additional sentence enhancement of 25 years to life. In his petition, he claims that (A) the trial court abused its discretion in denying his motion to sever the counts relating to separate incidents for trial; (B) the trial court abused its discretion in denying his motion to redact taped jail conversations; (C) he received ineffective assistance of counsel at trial; (D) the prosecutor knowingly put on perjured testimony; (E) the sentence imposed is cruel and unusual punishment and violates double jeopardy principles; and (F) he was denied due

1

process of law when the trial court conducted insufficient voir dire. For the reasons that follow, the claims are without merit.

## II. BACKGROUND

The following background summary was set forth in the unpublished opinion of the California Court of Appeal, Third District, No. C0141191. Petitioner is the defendant referred to therein.

> **Counts One and Two (Pacesetter offenses)**
>
> In the early afternoon of Friday, May 11, 2001, Nick Ly was shot and killed by an assailant who tried to rob him. Ly worked for a catering lunch truck business that was selling food at the Pacesetter Corporation. Friday was "payday" for Pacesetter employees, and on those days the lunch truck would often carry around $5,000 to cash the employees' paychecks. The lunch truck made two half-hour stops at Pacesetter on every business day, at 10:40 a.m. and 1:00 p.m.
>
> Two witnesses, Ken T. And Johnny C., saw the attempted robbery and shooting. The two provided similar general descriptions of the assailant-- a man between 5 feet 9 inches and 6 feet tall, having long dark curly hair and weighing between 250 and 300 pounds. Defendant fit this description as far as it went. These two witnesses also apparently saw the getaway car-- an older blue compact car resembling a Dodge Colt, that was being driven by a white male with blond/rust hair. A codefendant, Ted Cole, was charged with counts one and two and tried jointly with defendant Chiu.[1] [ ] Cole and his car matched th[e] general description [of the driver and the getaway car]. Ken T. also saw the assailant's gun, which was a revolver.
>
> There was a third witness, Greg M., who was not present at the robbery/shooting, but who was important in other ways. On the day of the shooting, M. dropped his daughter off at work at Pacesetter just before 11:00 a.m. After his daughter informed him that the lunch truck operators often extended credit to Pacesetter workers, M. decided to inquire whether they were interested in buying Visa/Mastercard services for him. M. Parked his car and noticed an older blue car nearby. This older car resembled a Dodge Colt or Geo Metro and had two men in it. One of the men

---

[1] The jury deadlocked regarding Cole, and the trial court declared a mistrial. On retrial, Cole was found guilty of first degree felony murder, attempted robbery, and special circumstances and sentenced to life without the possibility of parole. *People v. Cole*, No. C042903, 2004 WL 605196.

2

was white with dirty blond hair and a trimmed mustache. The other man, whom M. later passed in the breezeway "in real close proximity," "almost bumping shoulders," was described by M. generally along the lines of the general description provided by Ken T. and Johnny C.[2] The two men in the older blue car did not leave during the entire 20-plus minutes that M. was on the scene and talking to the lunch truck operators (one of these operators was the eventual victim, Ly). As M. left, the white man approached the truck.

In July 2001, M. helped the police develop a composite sketch of the man whom he passed in "real close proximity" on the morning of the shooting. This sketch was published in the Sacramento Bee on July 27, along with an article about the shooting and an offer of a $7,500 reward for information leading to the perpetrator's arrest and conviction.

In August 2001, M. viewed photo lineups of defendant and Cole, and defendant's photo "jumped out" at him. Said M.: "That was the gentleman I passed in the breezeway [on the day of the shooting],... I recognized him right away." M. picked out Cole's photo as well, describing it as being "the closest." At trial, M. positively identified defendant and Cole as the occupants of the older blue car that M. saw parked near him on the morning of the shooting.

At the end of July 2001, Frank Blattel informed the police, at first anonymously, that his ex-daughter-in-law, Venus, may have been involved or have information about the crime.

Venus subsequently provided information to the police about the Pacesetter shooting in exchange for a dismissal of charges against her (petty theft with a prior and possession of a hypodermic needle); she also admitted her role in the crime and inquired about the reward. At trial, Venus testified under a grant of immunity. Venus is a cousin of Ted Cole and his sister, Angel Leandro; Leandro was defendant's girlfriend. For about a month, all four of them roomed together until Venus was asked to move out, leaving her homeless and angry, according to Leandro.

For three or four months in 2000, Venus worked at Pacesetter and cashed her paychecks every Friday at the lunch truck. About one month before the shooting, Venus informed defendant and Cole about the truck and they discussed robbing its occupants. None of them was working at the time and they were all using substantial amounts of methamphetamine daily.

---

[2] Witnesses also variously described this man as white, Asian, Hispanic, and African-American.

Venus acknowledged playing a role in the Pacesetter robbery/shooting. [ ] On that day, she followed defendant and Cole to a parking lot about a half-mile from Pacesetter; defendant and Cole were in Cole's blue Mitsubishi (which was akin to a Dodge Colt), and she was in defendant's red Jeep Wrangler. The two men left and then returned about 20 to 25 minutes later. Upon their return, the two men switched to the jeep and had Venus drive the Mitsubishi by putting a license plate back on it. She claimed at that time she was not aware of the robbery.

Later, defendant told Venus about the botched robbery at Pacesetter, acknowledging that he "had to shoot the guy." He also told Venus that he had changed clothes after switching cars, and that he had thrown away on some side street the gun that he had used. Defendant was quite concerned that someone would find the weapon.

At the behest of the police, Venus twice in early August 2001 visited defendant in jail; he was there on another charge. Their conversations were recorded, and defendant made some incriminating remarks. These taped conversations were played for the jury, accompanied by transcripts.

Venus's mother, Dawn Gerlach, testified that Venus contacted her right after the Sacramento Bee's article appeared. Venus told Gerlach about what had happened while she waited in the parking lot on the day of the shooting. Gerlach replied that Venus had to report the incident. Later, Venus informed Gerlach that she might get the reward

**Counts Three, Four, and Five (Del Taco offenses)**

On July 18, 2001, about 12:40 p.m., a man robbed the cashier of a Del Taco restaurant from the drive-through lane. The man was in a red Jeep Wrangler and armed with a handgun. The cashier who was robbed, Abigail J., positively identified defendant as a robber. Two other Del Taco employees, Mark L. And Benjamin S., strongly linked defendant to the robbery through descriptions of the robber, his red Jeep Wrangler, and his shirt (a sports jersey).

Immediately after the robbery, David B., an employee at the gas station across from the Del Taco, saw defendant, who appeared panicky, pull into the station in a red jeep and change out of the sports jersey described by the Del Taco witnesses. B. positively identified defendant from a photo lineup and in court as the person he saw in the red jeep.

The day after the Del Taco robbery, a police officer in a marked car, who had been given a description of the robber and his car, spotted defendant in the red Jeep and, with backup, signaled defendant to stop. Defendant recklessly, but unsuccessfully, tried

4

> to evade the officers. The police found a fully loaded .357 -caliber
> revolver in the Jeep; more likely than not, this was not the weapon
> that had killed the lunch employee, Ly.

(C041191 opinion at 3-7.[3])

### III. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

### IV. ANALYSIS OF PETITIONER'S CLAIMS

A. Severance

Petitioner first alleges that the trial court abused its discretion in denying his motion to sever counts 1 and 2, the Pacesetter murder and robbery, from counts 3, 4, and 5, the Del Taco robbery, assault, and evasion, for separate trials. Petitioner states that the court "boot

---

[3] Maintained in this record as Lodged Doc. No. 1 (7/14/08).

5

strapped a much stronger case (the Del Taco robbery) to a much weaker case (the Pacesetter murder robbery)" in order to bolster the chances of conviction on the weaker case. (Second Amended Petition at 5.)

At trial, the judge found the offenses were properly joined pursuant to Cal. Penal Code §954 because they belonged to the same class of offense. (RT at 28.[4]) The California Court of Appeal agreed, finding the trial court did not abuse its discretion in refusing to sever the counts. (C041191 opinion at 8-11.)

"[T]he propriety of consolidation rests within the sound discretion of the state trial judge." *Fields v. Woodford*, 309 F.3d 1095 (9th Cir. 2002). Thus, habeas corpus relief is not available unless the joinder "actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process." *Davis v. Woodford*, 384 F.3d 628 (9th Cir. 2004) (citation omitted). "The requisite level of prejudice is reached only if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Davis*, 384 F.3d at 638; *see also Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir. 1998), *cert. denied* 528 U.S. 922 (1999). In evaluating prejudice, the Ninth Circuit focuses particularly on cross-admissibility of evidence and the danger of "spillover" from one charge to another, especially where one charge or set of charges is weaker than another. *See Davis*, 384 F.3d at 638 (*citing Sandoval v. Calderon*, 241 F.3d 765, 771-72 (9th Cir. 2001)).

The risk of undue prejudice is particularly great whenever joinder of counts allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible. *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1986). But in this case, evidence relating to the two separate sets of offenses would have been cross-admissible, at least to some extent to establish intent or identity. *See* Cal. Evid. Code §1101(b) (character evidence admissible to prove intent, identity, and various facts other than the defendant's disposition to

---

[4] The Reporter's Transcript on Appeal is lodged in this record. (7/14/08)

6

commit an act). The offenses petitioner was charged with occurred within three months of each other and were similar in nature. As the California Court of Appeal noted, both the Pacesetter and the Del Taco offenses involved robberies of eating establishments around lunch time with use of a handgun. (C041191 opinion at 9.) There was evidence that petitioner's red Jeep was involved at some point during each "getaway" and that he changed his clothes immediately after both robberies. *Id*. These and other common elements would likely have been cross-admissible at the severed trials.

Undue prejudice may be particularly great from the joinder of a strong evidentiary case with a weaker one. *See Lewis*, 787 F.2d at 1322; *Bean*, 163 F.3d at 1084. Petitioner is correct that evidence linking him to the Del Taco offenses was very strong; the case was built on the robbed cashier's eyewitness identification, other employees' corroborating descriptions, and the gas station attendant who testified that petitioner pulled into the station across the street and hurriedly changed out of a sports jersey. (C041191 opinion at 10.) The Pacesetter case, however, was not a weak case for severance purposes. Despite the fact that no eyewitness to the Pacesetter robbery positively identified petitioner at trial, the witnesses' descriptions were mostly consistent with his appearance, and other eyewitness testimony placed him in a car matching the description of his own, parked near the lunch truck, immediately prior to the robbery. (*Id*.) This evidence, along with the extensive testimony of Venus, the additional testimony of Venus' mother, and the incriminating statements petitioner made to Venus during her tape recorded visits to the jail,[5] sufficiently made the Pacesetter offenses a reasonably strong case for the prosecution. Despite petitioner's argument to the contrary, neither case was weak such that there was any danger of undue prejudice or "spillover" as the term was used in *Davis*, 384 F.3d at 638.

---

[5] In the tape recorded conversations, petitioner repeatedly told her she knew nothing, encouraged her to "disappear", inquired about who was "talking", and concocted an exculpatory theme that he did not remember where he was on that day because of his heavy methamphetamine use. (C041191 opinion at 10; CT at 390-443.) Petitioner's specific statements are set forth in more detail in subsection B.

7

1  Moreover, any existing prejudice from joinder may be limited through an
2 instruction directing the jury to separately consider each charge. *Davis v. Woodford*, 384 F.3d
3 628, 639 (*citing United States v. Lane*, 474 U.S. 438, 450 n.13 (1986) (concluding, in a case
4 regarding misjoinder of defendants, that a "carefully crafted limiting instruction" may reduce
5 prejudice "to the minimum" and that "[w]e cannot necessarily assume that the jury misunderstood
6 or disobeyed such instructions") (internal citations and quotation omitted)). Notably, during jury
7 instruction, the trial court read each charge in its entirety (RT at 1483-87), and instructed the jury
8 to consider the case of each defendant as if he were being tried alone and to "determine each
9 charge as to each individual defendant separately." (RT at 1520-21.)

Joinder of petitioner's offenses for trial was within the discretion of the state trial judge and did not render his trial fundamentally unfair. Neither case was weak such that there was danger of undue prejudice from joinder with a stronger case, and any existing prejudice was limited by the trial judge's instruction directing the jury to separately consider each charge. Even if petitioner's motion to sever had been granted, substantial common elements relating to both cases might well have been found to be cross-admissible. For all these reasons, due process did not require that petitioner receive separate trials for the Del Taco robbery charges and the Pacesetter robbery and murder charges.

B. Jail Tapes

Venus visited petitioner in jail on August 2 and 3, 2001; their conversations were recorded and later transcribed. (C041191 opinion at 11; CT at 390-443.) As noted in subsection A, in these conversations petitioner encouraged Venus not to say anything about the Pacesetter incident. Along these lines, he told Venus, "You know nothing. Absolutely." (CT at 391.) After Venus informed him about the newspaper article and apparently showed him a detective's business card (C041191 opinion at 12), petitioner stated, "Venus, we don't know anything. You hear me?" (CT at 393.) Petitioner told Venus to call his brother and tell him the situation, but warned her "[d]on't talk on our [telephone] line." (CT at 395.) Further comments in this regard

8

from petitioner included, "You weren't even at the scene. [¶]... [¶] You know nothing. I know nothing. They don't have shit." (CT at 397.) "Don't you ever spill your fuckin' guts, Venus [ ]" (CT at 398.); "Don't write [down any further information you get or find out]" (CT at 436.); "Disappear." (CT at 400); "Just stay gone" (CT at 405); "Look. You need to be gone a few months [ ]" (CT at 440); and "Fuckin' right now just don't trust nobody." (CT at 442.)

He also inquired about who was squealing: "Who do you think's-- ?" (CT at 391); and later, "Scott? [¶]... [¶] Then who? [¶]... [¶] Angel?" (CT at 396.) "So do you think it's Angel and -- [ ] Uncle Bunny (phonetic)?" (CT at 398-99.) He also asked whether the Dodge Colt (apparently mentioned in the newspaper article) had been painted. (C041191 opinion at 12; CT at 421.)

Petitioner relayed to Venus an exculpatory theme that he could not recall where he was on the day of the robbery and murder because of his heavy methamphetamine use. In response to Venus' question "So where were we?" he stated, "Well, I wasn't anywhere. I'm a fuckin' tweak. That was three months ago." (CT at 403.) He repeated that he was a "fuckin' tweak" with "no remote idea what they're fucking talking about[.]" (CT at 404.) Further comments along these lines included: "Look. Did you hear my story? [¶]... [¶] I'm a fuckin' tweak. I don't know where the fuck I was at that time. Are you kiddin' me? Please. That picture [sketch in the newspaper article], it looks nothing like me. [¶]... [¶] Nothing. 5'6["]? [¶]... [¶] Man, I'm 6', almost 6'1["]... I have no resemblance to a short ass Mexican man. [¶]... [¶] I'm fuckin' Asian... [O]h, I'm good. I'm good [ ]" (CT at 407-409.); "Look, if you all would have just let me dye [my hair] or cut it before-- [ ]" (CT at 415); and "Look... So you got the story?" (CT at 424.)

Petitioner also made various sexually explicit comments and derogatory references to homosexuals, and used a racial slur.[6] He asserts that this content could have been easily

---

[6] "Petitioner stated "Well, I need some fuckin' pictures of [my girlfriend]. [¶]... [¶] Somethin' naked. I don't know, maybe hold the letter in the cooch or somethin'. Give me some

9

redacted from the tapes and transcripts. Petitioner alleges that the trial judge abused his discretion in denying his motion brought pursuant to California Evidence Code §352 at trial to redact this content. (Second Amended Petition at 5.) In denying the motion, the trial court found that the references were collateral to the statements petitioner made regarding the issues related to the case. (RT at 469-70.) The trial court also found the defense's request to be untimely because the motion could have been made "at an earlier stage of the proceedings when perhaps the statements may have been better redacted." (RT at470.)

The California Court of Appeal determined that the trial court did not prejudicially abuse its discretion by declining to allow redaction of the challenged statements:

> First, we find merit, as did the trial court, in the prosecutor's argument against redaction. The prosecutor noted that the defense had seriously questioned the trustworthiness of defendant's taped jail statements, in that defendant likely knew he was being recorded (jailhouse signs said as much). The prosecutor argued that the entire conversations between Venus and defendant, including their challenged extraneous details, showed that the two of them were comfortable talking as very close, if not intimate, friends; in turn, this demonstrated the credibility of defendant's statements to Venus.
>
> Second, the redaction process was not as simple as defendant asserts. The line between relevant and supposedly irrelevant statements is not as clear as defendant makes it. Interspersed

---

scent." (CT at 422). At another point, he expressed a sexual interest in Venus, and told her to "keep turning around like a rotisserie chicken." (CT at 430.)

Petitioner stated that his housing assignment in jail was "like-- uh-- for trustees, for fuckin' first timers, and fuckin' gays, and shit. [¶] [¶] It must just be for gays because except me and a few other guys everybody else in there is a straight up fuckin' fag. It took me two weeks to fuckin' figure it out, but, man, they're like, "You want a ham"-- "No. I don't want no god damn ham sandwich." [Unintelligible.] I'm tellin' you. (CT at 419-20.) "Oh God. You know what it's-- fuckin' two nights ago was Polish sausage night. [¶]... [¶] Do you know what it's like weenie night on the gay ward? It's fuckin' sick, you dirty mother fuckers." (CT at 433.) "...I am gonna stay heterosexual. I don't care how long they keep me in here and play with their weenies. It's not happening. You know? [¶]... [¶]... [¶]... [¶]... [¶] Dirty mother fuckers. [¶]... [¶] [T]hey talk like that on the pod." [¶]... [¶] ["]That sexy little bitch.["] "I'm like God damn." (CT at 437-38.)

Apparently referring to his desire to use drugs when he got out of jail, petitioner stated "I want somethin' where I'm hackin', turning blue on the floor." [Venus:] "That's what he's got now." [Petitioner:] "Who? Fuckin' sweet nigger." (CT at 434-35.)

10

through the later, supposedly irrelevant portions of the tapes were defendant's "staging" of his story, and his incriminating statements about his hair, the Dodge Colt, "the story," having nothing in writing, beating this "thing," Venus "staying gone" for months, not trusting anyone, and his red Jeep.

Third, the trial court admonished the jury regarding the challenged statements. Said the court:

"Now you are the sole judges, ladies and gentlemen, of the weight, if any, that you are to give to the defendant's declarations contained in these tapes, in the conversations that you will hear on these tapes."

"You're going to hear references to matters that may be extraneous to this case, perhaps the use of profanity, perhaps reference to or suggestions of drug use, perhaps overtures about sex, perhaps overtures about sexuality or homosexuality and the like."[7]

"You are the sole judges, ladies and gentlemen, of the weight that you attach to any of these declarations, and I direct you to limit your consideration of the defendant's declarations on these tapes to matters that you determine bear on the factual issues before you."

"Because many of these things, references that I referred to are interrelated into the natural flow of the conversation, we want to give you the benefit of the whole conversation, but I also want to caution you not to unduly consider extraneous matters not related factually to the issues before you."

[The state appellate court continued:] Fourth and finally, the evidence against defendant regarding the Pacesetter incident was strong. It encompassed Venus' testimony of defendant's confession, defendant's own incriminating statements in the unchallenged portion of the taped conversations, and corroborating eyewitness testimony from Greg M., Ken T. And Johnny C.

(C041191 opinion at 15-17.)

The issue whether the trial court abused its discretion in denying petitioner's motion to redact is a question of state evidence law. Because a violation of state law does not ordinarily provide a basis for habeas relief (*Estelle*, 502 U.S. at 67-68), the evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if the proceedings were rendered so

---

[7] The California Court of Appeal noted that petitioner had not yet raised the issue of redacting the racial slur at the time this admonition was given. (C041191 opinion at 16.)

11

fundamentally unfair as to violate due process. *Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000), *cert. denied*, 532 U.S. 984 (2001); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999). In order for erroneously admitted evidence to constitute a due process violation, the evidence must be "be of such quality as necessarily prevents a fair trial." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). In other words, "[o]nly if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." *Id*. (emphasis in original).

As the state appellate court noted, there was a permissible inference the jury could have drawn from the challenged evidence. Petitioner's tone and language, including the explicit remarks and derogatory references, might have allowed the jury to infer that he and Venus were comfortable talking as close friends, thus increasing the credibility of the statements where the defense had questioned the credibility of the statements in the taped conversations. In addition, the jury heard an adequate limiting instruction. Overall, the admitted evidence was not of the quality that "necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920. There was no due process violation and petitioner is not entitled to relief on this claim.

C. Ineffective Assistance of Trial Counsel

Petitioner claims that he received ineffective assistance of counsel at trial. (Second Amended Petition at 6.) A showing of ineffective assistance of counsel has two components. First it must be shown that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance,'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689), and that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

The second factor required for a showing of ineffective assistance of counsel is actual prejudice caused by the deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice

is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.; *see also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

Petitioner specifically complains that trial counsel (1) failed "in not asking potential jurors adequate questions during voir dire as to the contents of the taped conversations;" (2) "failed to prepare and review all evidence presented against petitioner at trial;" and (3) failed to timely file a motion to redact the contents of the taped jail conversations. (Second Amended Petition at 6.)

Petitioner's first two allegations are vague and conclusory, with insufficient facts to support the ultimate conclusion about counsel's performance. For example, petitioner does not identify the additional questions he believes should have been asked during voir dire nor the evidence that was allegedly not prepared or reviewed.[8] These allegations are insufficient to raise a cognizable claim of ineffective assistance of counsel. *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) (conclusory allegations that counsel provided ineffective assistance "fall far short of stating a valid constitutional violation" (*citing James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994); *Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th cir. 1970) ("[a]llegations of fact, rather than conclusions, are required").

Moreover, petitioner cannot satisfy the prejudice prong of the *Strickland* standard with respect to his third allegation. The California Court of Appeal, Third District, held:

> We have concluded that the trial court did not prejudicially abuse its discretion in failing to redact the challenged statements in the taped conversations. Consequently, defendant will be unable to satisfy the prejudice prong of the ineffective assistance standard.

(C041191 opinion at 17.)

---

[8] Nor were those details included in petitioner's state court filings.

1   There is no reasonable probability that the result of the proceeding would have

2   been different had counsel moved to redact the taped conversations at an earlier stage. First,

3   although the trial judge indicated that the motion was untimely, the court also noted in denying the

4   motion it's finding that the challenged references were collateral to petitioner's statements

5   regarding the issues related to the case. (RT at 469-70.) The motion might have been denied for

6   the same reason even if counsel had raised it earlier. Second, the evidence against petitioner

7   regarding the Pacesetter offenses was strong, encompassing Venus' testimony of his confession,

8   his own incriminating statements in the unchallenged portion of the taped conversations, and

9   corroborating eyewitness testimony from three individuals, including one who placed him at the

10  scene of the crime just prior to its occurrence. (C041191 opinion at 17.)

Petitioner's allegations do not demonstrate, either individually or in combination, ineffective assistance of trial counsel under the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner is not entitled to relief on this claim.

### D. Prosecutorial Misconduct

Petitioner alleges that the prosecutor knowingly used the perjured testimony of witness Venus to get a conviction. (Second Amended Petition at 6.) Petitioner complains that "[t]he prosecutor himself admitted that Venus Blattel was lying but still allowed her testimony to be entered as evidence." *Id*. Petitioner provides no additional facts or allegations relating to this claim. He has not identified any particular alleged false testimony, or evidence of its falsity.[9] To warrant federal habeas relief, "the petition is expected to state facts that point to a real possibility of constitutional error." *O'Bremski v. Maass*, 915 F.2d 418, 420 (9th Cir. 1990). Mere conclusions that federal rights have been violated, without specifics, do not state a federal claim. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). Petitioner is not entitled to habeas corpus relief on his claim that the prosecutor allowed witness Venus to give perjured testimony.

---

[9] Nor were those details included in petitioner's state court filings.

### E. Sentence Imposed

Petitioner was convicted of special circumstance murder and attempted robbery arising from one incident, and robbery, assault with a deadly weapon, and evading a police officer arising from the other. (C041191 opinion at 1.) He was sentenced to life without the possibility of parole in addition to an 18 year term; the jury also found that he personally discharged a firearm to commit the murder, resulting in a 25 year to life enhancement. *Id*.

Petitioner alleges that the sentence he received constitutes cruel and unusual punishment and that it violates double jeopardy principles. (Second Amended Petition at 6a.)

In *Lockyer v. Andrade*, 538 U.S. 63 (2003), the United States Supreme Court held that in addressing an Eighth Amendment challenge to a prison sentence, the "only relevant clearly established law [ ] is the gross disproportionality principle, the precise contours of which are unclear and applicable only in the 'exceedingly rare' and 'extreme' case." *Id*. at 73 (*citing Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991); *Solem v. Helm*, 463 U.S. 277, 290 (1983); and *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)). The Court concluded that two consecutive 25 years to life sentences with the possibility of parole, imposed under California's Three Strikes Law following two petty theft convictions with priors, did not amount to cruel and unusual punishment. *Andrade*, 538 U.S. at 77; *see also Ewing v. California*, 538 U.S. 11 (2003) (upholding sentence of 25 years to life imposed for felony grand theft); *Harmelin v. Michegan*, 501 U.S. 957 (1991) (upholding sentence of life without the possibility for parole for a first time offense of possession of a substantial amount of cocaine).

"The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Ewing*, 538 U.S. at 21. Where the crime is violent or especially grave, a life sentence without the possibility of parole is constitutional. *Harmelin*, 501 U.S. at 1002, 1004 (Kennedy, J. concurring). Petitioner was convicted of first degree murder, a violent crime, among other serious offenses. His sentence does not run afoul of the Eighth Amendment. *See Harmelin*, 501 U.S. at

1002, 1004.

Nor does it constitute double jeopardy. The Double Jeopardy Clause precludes successive prosecutions or multiple punishments for the same offense. *Monge v. California*, 524 U.S. 721, 727-28 (1998). Although petitioner states that his sentence is a "clear case" of double jeopardy, he provides no explanation. (Second Amended Petition at 6a.) In his direct appeal, he unsuccessfully argued that his 25 year to life enhancement was subsumed within his greater sentence of life without the possibility of parole. (C041191 opinion at 18.) To the extent he is asserting that the sentence enhancement violates double jeopardy, he is wrong. Sentence enhancements do not "punish" a defendant within the meaning of double jeopardy. *United States v. Watts*, 519 U.S. 148, 154 (1997). Rather, they increase the given sentence because of the manner in which the crime was committed. *Id*. "[T]he defendant is punished only for the fact that the present offense was carried out in a manner that warrants increased punishment." *Id*. at 155, *quoting Witte v. U.S.*, 515 U.S. 389, 403 (1995). Moreover, the Double Jeopardy Clause does not prohibit the state from prosecuting a defendant for multiple offenses in a single prosecution. *United States v. Kuchinski*, 469 F.3d 853, 859 (9th Cir. 2006). Petitioner is not entitled to relief on the ground that his sentence is cruel and unusual or in violation of double jeopardy.

      F.     Voir Dire

For his final claim, petitioner alleges that the trial court failed to adequately conduct voir dire. He states that prospective jurors should have been questioned "as to the nature of evidence that they would be exposed to [in the taped jail conversations] such as racial or sexual bias." (Second Amended Petition at 6a.)

Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id*. at 729-30 (*quoting Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Similarly, lack

of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule. *Rosales-Lopez*, 451 U.S. at 188. A trial court's failure to ask specific questions during voir dire will warrant habeas corpus relief only if the omission rendered the trial fundamentally unfair. *See Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991).

Petitioner has not shown that questioning the jurors on this issue would have revealed any actual or perceived bias that would have resulted in dismissal of any jurors. As noted before, the offensive language was, for the most part, fleeting in the taped conversations, and in the context of the whole trial, was even less significant. Moreover, the judge admonished the jurors to only consider the relevant portions of the tape. Petitioner's claim is once again conclusory and lacking in supporting facts. Petitioner has not established that the lack of additional voir dire questioning rendered his trial fundamentally unfair in violation of due process.

## V. CONCLUSION

For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 13, 2009

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE